UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

T.B. and D.B., on behalf of their minor child T.B.,

                     Plaintiffs,

   -v-

HAVERSTRAW-STONY POINT CENTRAL
SCHOOL DISTRICT,

                 Defendant.

Case No. 11-CV-5421 (KMK)

OPINION AND ORDER

---

Appearances:

Gloria M. Bruzzano, Esq.
Marykate O'Neil, Esq.
Neal Howard Rosenberg, Esq.
Law Office of Neal Rosenberg
New York, NY
*Counsel for Plaintiffs*

James P. Drohan, Esq.
Thomas, Drohan, Waxman, Petigrow & Mayle, LLP
Hopewell Junction, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

      T.B. and D.B. ("Plaintiffs") brought this action pursuant to the Individuals with

Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and New York Education Law

§ 4404.3, seeking to overturn the determination of the State Review Officer ("SRO") that the

Haverstraw-Stony Point Central School District ("District") is not required to reimburse

Plaintiffs for their unilateral placement of their child, T.B., at the Community School

("Community") for the 2010–11 school year.[1]  The Parties cross-moved for summary judgment.

---

[1] In their Complaint, Plaintiffs cite § 4403.3 of the New York Education Law, (Compl. ¶ 1), but the Court assumes this is a typographical error, because the procedure for appealing a state determination to a federal district court is in fact contained in § 4404.3.

For the reasons given below, Plaintiffs' Motion for Summary Judgment is denied, and the

District's Motion is granted.

I.  Background

A.  Factual Background

  The bare facts, as carefully found by the state administrative officials, are not in dispute

in this federal proceeding.  Indeed, no Party has submitted any evidence before this Court that

was not before the state hearing officers.  Therefore, the Court relates the facts as found by the

state administrative officials, and as reflected in the state administrative record.

  1. Preschool and Kindergarten, in Public School

  T.B., a minor, lives within the Haverstraw-Stony Point Central School District in a home

with his parents, grandparents, and three siblings.  (Tr. 604.)  At age two, as T.B. presented with

some developmental problems, he began receiving speech therapy through a local early

intervention program.  (*Id.* at 605.)  T.B. continued to receive special education services during

preschool through the school district's Committee on Preschool Special Education.  (*Id.* at

605–06.)

  On March 26, 2007, in preparation for T.B.'s kindergarten year, the District convened a

Committee on Special Education, or "CSE," to prepare an Individualized Education Program, or

"IEP."  (Joint Exh. 29.)  A CSE, which is a creature of New York law, is a group composed of

parents and educators that is responsible for formulating the appropriate education for a child

with disabilities.  *See* N.Y. Comp. Codes R. & Regs. tit. 8 § 200.3(a)(1).  The CSE's educational

plan is described formally in an IEP, which, under federal law, must be updated at least annually.

*See* 20 U.S.C. § 1414(d)(2); *see also Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122

(2d Cir. 1998) (describing detailed requirements of an IEP).  T.B. was classified as having an

"Other Health Impairment."  (Joint Exh. 29 at 1.)

The kindergarten IEP noted that T.B. had "age level cognitive skills," but had "speech articulation delay and mild fine motor weakness, coupled with a diagnosis of Attention Deficit Disorder," which is commonly known as "ADD."  (Joint Exh. 29 at 2–3.)  The IEP recommended that T.B. be placed in a general education class, with one hour per week of "consultant teacher direct" services, plus weekly occupational and speech therapy.  "Consultant teacher direct" service, as defined by New York regulation, is "specially designed individualized or group instruction provided by a certified special education teacher . . . to a student with a disability to aid such student to benefit from the student's regular education classes."  N.Y. Comp. Codes R. & Regs. tit. 8 § 200.1(m)(1).  T.B. attended public school in the District, and followed that program.  (Tr. 620.)

In November 2007, the CSE met to assess T.B.'s progress and prepare another IEP report.  (Joint Exh. 5.)  The report was mixed.  The CSE noted that T.B. had "made a relatively smooth transition to the kindergarten program," and had "made progress in his ability to follow classroom routines and participate in group activities."  (*Id.* at 3.)  But the report noted that T.B.'s "distractability and impulsive style continues to impact upon his overall progress" toward gaining speech and language skills, and he also frequently "resists the direction of teachers." (*Id.*)  At the meeting, T.B.'s mother Mrs. B. requested additional services given T.B.'s speech difficulties, but that suggestion was tabled in favor of waiting for a coming reevaluation.  (*Id.* at 5.)

That reevaluation occurred on January 28, 2008, and in the meantime T.B. had undergone a number of evaluations.  (Joint Exh. 4.)  The report noted that T.B.'s "overall language abilities are below average," and that his overall test scores, which were now in the

Average to Low Average range, were affected by his "limited attention and distractability." (*Id.* at 3.)  Academically, T.B. was functioning "within the low average to borderline range," notably in areas such as developing reading and writing skills. (*Id.*)

The CSE continued T.B.'s general education placement, but it increased certain support services: occupational therapy was increased from once to twice per week, and weekly counseling sessions were added "to address social skills." (*Id.* at 5.)  Mrs. B. again expressed concern with these services, as it was her view that T.B. needed to be in a "special class with a small number of students," though not the special class that the District had in place, because those students were lower functioning than T.B. (*Id.*)

Also in January 2008, T.B. was evaluated at the Pediatric Behavioral Center, and he was diagnosed with Attention Deficit Hyperactivity Disorder, Combined Type ("ADHD"); Oppositional Defiant Disorder ("ODD"); and Pervasive Developmental Disorder, not otherwise specified ("PDD-NOS"). (Pl. Exh. N.)  The report from the psychiatrist provided the generalized recommendation that "[c]hildren with these disorders often benefit" from a variety of educational modifications including, as relevant here, a small class to limit distractions and improve compliance with rules, social skills training, and psychological support. (*Id.*)  "Ideally," the report concluded, T.B. "would be in a classroom that focused on addressing the specific needs of children with PDD-NOS." (*Id.*)

The next CSE meeting was on April 7, 2008.[2] (Joint Exh. 3 at 5.)  According to that report, T.B. "has grown in all areas this year," and his academic performance was "slow and steady." (*Id.* at 3.)  In support, the report relied on an April 3, 2008 academic report finding that,

---

[2] In the meantime, T.B. had been diagnosed with a form of autism, but that diagnosis was later reversed. (Joint Exh. 3; Joint Exh. 20.)  Because the CSE consistently maintained that "Other Health Impaired" was T.B.'s proper classification and IEPs were developed according to that diagnosis, no Party has asserted that the autism diagnosis has any relevance here.

between September 2007 and March 2008, T.B. could label nine more letter names, out of 52 — this total includes upper- and lower-case letters — and could identify five sounds, where previously he could not identify any.  (*Id.*)  But T.B. continued to display deficits in "memory, fine motor development, attention and interpersonal skills."  (*Id.* at 5–6.)  With regard to T.B.'s placement for first grade, the District continued to recommend T.B. stay in the general education classroom with increased support services.  (*Id.* at 6.)  Mrs. B. felt this was not enough, but she wanted to consider various options, and the issue was tabled.  (*Id.*)

The next meeting was May 21, 2008.  (Joint Exh. 3 at 1.)  The CSE's recommendation was to move T.B. to first grade with increased support services, including year-round schooling, but Mrs. B. wanted T.B. to be in a special class for all of his subjects.  (*Id.* at 5.)  The District representatives advised Mrs. B. of her means of challenging the Board's decision.  (*Id.*)

At Mrs. B.'s request, the CSE met again on June 18, 2008.  (Pl. Exh. MM.)  With the whole year in perspective, the CSE saw "considerable progress . . . in the areas of readiness skills and social development," and it reported that this growth "appears to have positively impacted upon [T.B.'s] availability to learning."  (*Id.* at 5.)  The District maintained its recommendation, and this time Mrs. B. agreed with it.  (*Id.*)  T.B.'s year-end progress report showed that he had achieved one of thirteen goals — to "transition appropriately" — had made satisfactory progress toward eleven others, but that he had made only "some progress" toward one of his reading goals.  (Pl. Exh. D.)

Pursuant to his IEP, T.B. spent parts of July and August in a special education class.  (Joint Exh. 2 at 2.)

2. First Grade: 2008–09, in Public School

T.B. began first grade in the fall of 2008.  (Joint Exh. 2 at 1.)  According to the IEP

5

agreed to the previous June, T.B. was placed in a general education classroom, with direct

consultation services, at a maximum student-teacher ratio of 15:1, for 10 hours per week, plus

weekly counseling, occupational therapy twice per week, and speech/language therapy three

times per week.  (*Id.*)

A subcommittee of the CSE, which included representatives from the District and both of

T.B.'s parents, met on January 22, 2009 to assess T.B.'s progress.  (*Id.*)  The subcommittee

wrote that T.B. had "shown growth in all aspects of development."  (*Id.* at 3.)  By that point, he

had "mastered most letters and sounds of the alphabet" and had "developed a small sight

vocabulary."  (*Id.*)  He had also "established a more secure number sense."  (*Id.*)  But his

language and behavioral problems persisted, as he "becomes more agitated for writing tasks,"

and "refocusing and redirection" were necessary for many of his speech/language therapy

sessions.  (*Id.*)  Socially and emotionally, T.B. had "become more social and less impulsive,"

and he "continue[d] to enjoy attending weekly counseling sessions," though in class he was "at

times anxious about his performance."  (*Id.* at 4.)  "Once he believes he is not capable of

completing a task," continued the report, "he tends to shut down."  (*Id.*)  The meeting minutes

show that the committee thought T.B. had "made slow and steady progress," and there were no

changes in the recommended services, nor any noted disagreement from T.B.'s family.  (*Id.* at

5.)

In the spring of 2009, T.B. underwent a more comprehensive evaluation than he ever had

undergone before, culminating in a "team conference summary" produced by specialists at the

Children's Evaluation and Rehabilitation Center at the Albert Einstein College of Medicine.

(Joint Exh. 20.)  The report was dated March 11, 2009, and the lead evaluator was Dr. Shaune

Bornholdt.  (*Id.* at 1.)  The "Team Impressions" section of that report is worth reproducing at

length, as this report forms the core of Plaintiffs' argument that T.B. required a private school

placement:

> Across evaluations, T.B. presented as a related child with very significant speech/language deficits.  His phonological/articulation difficulties also affected communication.  He was sometimes oppositional, often anxious, sometimes distractible and inattentive, and sometimes experienced marked difficulty in reciprocal interaction and play.  T.B. also requires support in reading and writing skills.
>
> Despite his problems with reciprocity in some situations, T.B. was a great bargainer, making eye contact, and actively negotiating in favor of his own agenda.  He could shut down especially when anxious, but in situations in which he was comfortable, he did not present as an autistic child. . . . In any but a very small class, he is likely to be overwhelmed, no matter how many adjustments are made to meet his needs in the context of the class.  An integrated class, which usually includes the regular number of students or slightly fewer, is not appropriate at this time.
>
> T.B. is a child with normal intelligence, described as curious and interested in the world.  Finding the right class for him will be challenging, because he has clear strengths, such as his cognitive ability as indicated by past evaluations, and his good ability in math.  He also continues to have significant weaknesses, especially in language, and when is frustrated he can be oppositional.  He needs a small, structured, self-contained class in which he can receive services that will help him to improve his speech/language abilities, address his learning difficulties, develop his academic strengths, reduce his anxiety, improve attention, address his behavioral difficulties, and develop his social skills.  There should be means to address behavioral differences, and the class should include well-motivated children of normal intelligence, who can serve as good social models and play partners for him.  Reading/writing difficulties should be addressed with a multi-sensory approach, and provision should be made for T.B. to further develop his good math skills.  It is crucial that T.B. continue to receive related services, including intensive speech/language therapy and other services, as well as outside support services that are currently in place.
>
> Given the constraints, it may be difficult to find a small, self-contained class that meets T.B.'s needs in his district.  An out-of-district or private setting may therefore have to be sought.

(Joint Exh. 20 at 7–8.)  The evaluators later recommended that the "small, self-contained class"

should contain "no more than 12 children."  (*Id.* at 8.)

Later, in approximately March or April 2009, T.B.'s first-grade teacher had a conversation with his special education teacher about T.B.'s reading and writing development. (Tr. 411.)  The teacher testified that T.B. "was below grade level and he was not making the progress we had hoped he would make.  Our goals for him were not coming." (*Id.*)  T.B. was then placed in a group of two students in a program with the goal of "strengthening T.B.'s fundamental knowledge of basic reading concepts." (Joint Exh. 12 at 1.)  The group met four times per week for 35 minutes per class. (*Id.*)

Several different progress reports were completed around April 2009, and the SRO decision does a thorough job of detailing them. (SRO 6–7.)  The general education first-grade teacher, in line with her above-mentioned testimony, wrote in an April 29, 2009 report that T.B. was impulsive, overwhelmed, and often confused. (Pl. Exh. OO.)  Indeed, she later testified that, of the twenty first-graders in her class, T.B. "was making the slowest progress." (Tr. 424.)  However, the teacher in that report also wrote that T.B. had made "outstanding progress" in math. (Pl. Exh. OO.)

An April 5, 2009 report from the school's counselor noted that T.B. "enjoys participating" in counseling sessions. (Joint Exh. 21 at 1.)  The report also noted T.B.'s anxiety but stated that he had "made some progress toward achieving his goals." (*Id.* at 2.)  T.B.'s speech-language therapist and his occupational therapist similarly reported that T.B. had made some progress and had shown some areas of strength — his speech and language therapist reported "slow but steady" progress; his occupational therapist noted that he "appears to enjoy coming to therapy and continues to separate easily form the morning program to do so" — but T.B. was also delayed in many of his skills, and he was often difficult or oppositional. (Joint Exh. 9, 23.)

Also sometime in the spring of 2009, Mrs. B. heard about a small private school in Teaneck, New Jersey called the Community School, which Mrs. B. went to visit. (Joint Exh. 48 at 7.) Community is a school for students whose cognitive functioning is in the normal range, but who have various learning and behavioral difficulties, like those that T.B. has, and who often have reading and writing delays. (Pl. Exh. U.) For T.B.'s program, there are a maximum of 12 students per class, with three teachers. (*Id.*) From her online research, Mrs. B. found that Community was a New York state approved school, which means that such a school "could be approved on [T.B.'s] IEP and [she] could get state funding to send him there." (Tr. 661.)

T.B. also received additional testing in the spring of 2009, and then the CSE met on June 22, 2009 to create an IEP for T.B.'s second-grade year. (Joint Exh. 18.) The meeting minutes begin by noting that T.B. "has made a great deal of progress this past year in all areas, with the exception fo reading and writing." (*Id.* at 5.) T.B. "has difficulty making connections in reading and is a reluctant writer." (*Id.*) He also continued to show signs of anxiety and distractability. (*Id.*) Yet, at the same time, the CSE noted concrete signs of progress. First, T.B. was "above grade level in math"; second, he was making progress toward his therapy goals; third, he had made "notable gains" using the intensive, multi-sensory reading program which had begun that spring; and fourth, his social skills were "his greatest area of growth," and he could now "interact appropriately with peers and can maintain friendships." (*Id.*) His report card showed that he was meeting grade level standards or making substantial progress toward them in all subjects except reading and writing. (Pl. Exh. E, PP). Finally, his year-end progress report showed that he had achieved four of 17 goals, and he was making progress toward the others. (Pl. Exh. NN.)

For his second-grade IEP, the District suggested keeping T.B. in a general education setting but increasing his small group, intensive reading instruction to 45 minutes per day, each day.  (Joint Exh. 18 at 1.)  The District continued to recommend that T.B. receive 10 hours per week of direct teacher consultation, plus the weekly or twice-weekly small group or individual counseling and therapy sessions he had been receiving.  (*Id.*)  Finally, the IEP added 30 minutes per week of "indirect" consultation services, which is "consultation provided by a certified special education teacher . . . to regular education teachers to assist them in adjusting the learning environment and/or modifying their instructional methods to meet the individual needs of a student with a disability who attends their classes," N.Y. Comp. Codes R. & Regs. tit. 8 § 200.1(m)(2).  (*Id.*)

### 3. Second Grade: 2009–10, at Community School

The second-grade IEP was never implemented, because T.B.'s parents unilaterally placed him at the private Community School for his second-grade year.  (Tr. 1588.)  There was apparently some litigation around this, ultimately resulting in a settlement, the details of which are not in the record.  (Tr. 44.)

The record shows that, at Community, T.B. made academic and social progress, though with some caveats.  Between September 2009 and April 2010, his reading score on the WADE standardized test went up substantially, and his other language and speech metrics also improved.  (Pl. Exh. ZZ.)  His June 14, 2010 IEP explained that he "has made gains in reading, whereas he was reportedly a non-reader in September."  (Joint Exh. 15 at 4.)  Dr. Bornholdt, the lead evaluator at Einstein, testified that this skills increase was due to "hard work," especially the use of the Wilson Fundations reading program.  (Tr. 841.)  Behaviorally, the June 14, 2010 IEP report stated that T.B. "has become a more confident, cooperative learner and continues to

benefit from the same daily routine."  (Joint Exh. 15 at 6.)  Moreover, T.B. "no longer demonstrates 'meltdowns,'" though he "still may get agitated and cry, but at a greatly reduced rate."  (*Id.* at 5.)

However, Dr. Bornholdt testified that, during the same period, T.B.'s math fluency skills "went down" on the test scores, though the specialist testified that he couldn't "really tell" why that was or whether it was just something of a random fluctuation or outlier test.  (Tr. 853.)  The low test score could have been because of T.B.'s attentional problems, but that was Dr. Bornholdt's speculation.  (Tr. 853.)  The low score may indeed have been an anomaly: the June 14, 2010 IEP report noted that math was still "an area of strength" for T.B.  (Joint Exh. 15 at 4.) And his June 2010 progress report from Community — a report that is somewhat similar to the IEP goals progress reports that he had received while in public school — showed that in the areas of speech/language, reading, and writing, T.B. had made progress toward his goals but had not received one "objective met" evaluation in those three areas.  (Pl. Exh. Y.)

### 4. Third-Grade: The Challenged IEP for 2010–11

On June 14, 2010, the CSE met to create the IEP for T.B.'s upcoming third-grade year of 2010–11.  (Joint Exh. 15.)  Based on the data above and T.B.'s test scores and progress for the several prior years, the CSE recommended that T.B. be placed in the District rather than at Community, and it created a different academic program for 2010–11 than it had proposed for 2009–10.  (*Id.* at 6.)

T.B. was to be placed in a general education third-grade classroom, with two hours per week of direct teacher consultation and one hour per week of indirect teacher consultation.  (*Id.* at 1.)  T.B. would also be placed in a special education class for reading and language arts for 90 minutes per day, every day, at a 15:1 ratio.  (*Id.* at 2.)  T.B. would also receive supplemental

reading instruction, using the same Wilson program he had received both at Community and in the District, for 40 minutes per day, every day.  (*Id.*)  His individual or small-group therapy scheduling included seeing a counselor once per week for 30 minutes, an occupational therapist twice per week for 30 minutes each session, with a ratio of 5:1, and a speech/language therapist three times per week, also with a ratio of 5:1.  (*Id.*)  Last, the IEP notified all of T.B.'s teachers that he benefits from short breaks because he "displays a low frustration tolerance and increased anxiety when engaged in tasks that he perceives as difficult."  (*Id.* at 2–3.)

At the meeting, Mrs. B. informed the CSE that she disagreed with the placement, and that she would unilaterally place T.B. at Community for his third-grade year.[3]  (*Id.* at 6.)  On August 3, 2010, T.B. was again evaluated by the team at Einstein headed by Dr. Bornholdt, and Dr. Bornholdt again recommended that T.B. be placed in a small, structured class of no more than 12 children.  (Pl. Exh. JJ at 3.)

### 5. The Due Process Complaint and the Placement at Community

On August 11, 2010, Plaintiffs' counsel informed the school district that they requested an impartial hearing regarding whether the June 14, 2010 IEP was reasonably calculated to provide T.B. with educational progress for his third-grade year.[4]  (Joint Exh. 24.)  Plaintiffs contended that the IEP did not do so, because the it did not provide for the full-day small class size and intensive instruction of Community, which T.B. required to make progress.  (*Id.* at 6–7.)  They requested a hearing where they could get relief in the form of a determination that Community or a similar private school was the appropriate educational placement for T.B. for the third-grade year; or, in the alternative, that the District would be required to reimburse

---

[3] In February 2010, Mrs. B. had put down a $10,000 deposit for the following school year, but the director of Community testified that the deposit was refundable.  (Tr. 1590.)

[4] The District's legal obligations to T.B. are described below in Section II.A.

Plaintiffs for the cost of sending T.B. to Community for third-grade.[5]  (*Id.* at 7.)  In September

2010, Plaintiffs enrolled T.B. at Community for the 2010–11 academic year.  (Pl. Exh. BB.)

The case was heard before an impartial hearing officer, or "IHO," over the course of nine

days from October 19, 2010 through December 14, 2010.  (IHO 2–3.)  In a written decision of

January 26, 2011, the IHO agreed with Plaintiffs that the June 14, 2010 IEP was legally

inadequate because it was not reasonably calculated for T.B. to make educational progress.  (*Id.*

at 10–19.)  Because the IHO found Community an appropriate placement, he ordered that the

District reimburse Plaintiffs for the full cost of tuition for the 2010–11 school year, and he also

ordered the District to develop an IEP that would place T.B. in Community for that school year.

(*Id.* at 20.)

The District appealed to a state review officer, or "SRO."  (SRO 15.)  In a 24-page,

single-spaced opinion dated April 18, 2011, the SRO reversed.  (*Id.* at 24.)  The SRO held that

the hearing record demonstrated that the District "met its burden to show that the June 2010 IEP

accurately reflected [T.B.'s] needs and that the district's recommended program was reasonably

calculated to enable the student to receive educational benefits."  (*Id.*)  Accordingly, the SRO

annulled the IHO's order requiring tuition reimbursement and the development of a new

2010–11 IEP.  (*Id.*)

B.  This Lawsuit

Plaintiffs initiated this federal lawsuit on August 4, 2011.  Plaintiffs move for summary

judgment, asking this Court to set aside the SRO's decision and grant Plaintiffs' claims for

---

[5] Attendance at Community cost approximately $32,758 for T.B.'s third-grade year.  (Pl.
Exh. BB.)

tuition reimbursement for the year, as well as attorneys' fees and other related relief.  (Pl. Mot. for Summ. J. 1.; Compl. 26–27.)  The District also moves for summary judgment, asking this Court to affirm the SRO's decision that the June 14, 2010 IEP was legally sufficient; alternatively, the District contends that Plaintiffs are not entitled to reimbursement because the Community School was not an appropriate placement for T.B. and/or because the equities do not weigh in Plaintiffs' favor.  (Def. Mem. i–ii.)  The Parties rely exclusively on the administrative record, having submitted no additional evidence.  The Court held oral argument on March 6, 2013.

## II.  Discussion

### A. Legal Framework

The IDEA requires that states receiving federal funds provide a "free appropriate public education" to "all children with disabilities."  20 U.S.C. § 1412(a)(1)(A); *see also Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 179 (1982) (describing the IDEA's predecessor statute as an "ambitious federal effort to promote the education of handicapped children").  This is commonly known as a "FAPE."  A school district within such a state, like the District here, provides a FAPE when it offers "special education and related services tailored to meet the unique needs of a particular child, [which are] 'reasonably calculated to enable the child to receive educational benefits.'"  *Walczak*, 142 F.3d at 122 (citation and internal quotation marks omitted) (quoting *Rowley*, 458 U.S. at 207).  These services are set forth in the child's IEP, "the central mechanism by which public schools ensure that their disabled students receive a free appropriate public education."  *Polera v. Bd. of Educ.*

*of the Newburgh Enlarged City Sch. Dist.*, 288 F.3d 478, 482 (2d Cir. 2002); *see also* 20 U.S.C. § 1414(d)(1)(A)-(B), (d)(3) (setting out requirements for IEPs and their development).

The IDEA "does not itself articulate any specific level of educational benefits that must be provided through an IEP." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 245 (2d Cir. 2012). Rather, the statute ensures an "appropriate" education, but "not one that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (internal quotation marks omitted). Thus, "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'" *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 130). Indeed, the IDEA does not require schools to "maximize the potential" of students with disabilities, but instead was intended "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *M.H.*, 685 F.3d at 245 (internal quotation marks omitted).

In New York, if a parent disagrees with an IEP prepared by a school district, the parent may challenge the IEP by requesting an "[i]mpartial due process hearing," 20 U.S.C. § 1415(f), before an IHO appointed by a local school board, *see* N.Y. Educ. Law § 4404(1)(a). The IHO's decision may be appealed to an SRO, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2), and the SRO's decision may be challenged in either state or federal court, *see* 20 U.S.C.

§ 1415(i)(2)(A); *see also M.H.*, 685 F.3d at 224–25 (generally describing the IHO and SRO process).[6]

   The Supreme Court has repeatedly held that if a state fails in its obligation to provide a disabled child a FAPE under the IDEA, the IDEA permits the child's parents to seek reimbursement from school districts for the private placement of the child.  *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246–47 (2009); *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12 (1993); *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985).  The IDEA also allows a district court hearing civil actions brought under the IDEA to grant "such relief as the court determines is appropriate." *Forest Grove*, 557 U.S. at

---

   [6] While the section of the Complaint titled "Nature of the Proceeding" states that this action is an appeal brought pursuant to both the New York Education Law and the IDEA, (Compl. ¶ 1), the Complaint's three causes of action all relate to the IDEA, (*id.* ¶¶ 156–61).  And violations of the New York Education Law are not discussed in Plaintiffs' Memoranda of Law. (Pl. Mem.; Pl. Reply.)  Thus, the Court here discusses only the IDEA claim.

   While the difference is of little legal moment because of the substantial overlap between the state and federal claims, the Court notes one possible difference — albeit one not mentioned by Plaintiffs.  Following the Supreme Court's decision in *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005), which, as a matter of *federal* law, placed the burden in a due process proceeding on a plaintiff to show that an IEP was inappropriate, the New York Education Law was amended so that the district bears the burden of showing that the IEP was appropriate.  *See* N.Y. Educ. Law § 4404(1)(c).  Whether this burden-shifting is permissible or whether it is preempted by the IDEA is a question expressly left open in *Schaffer* and not yet decided by the Second Circuit.

   This Court need not decide the question here because Plaintiffs have not pressed any state law claims in their causes of action or in the memoranda in support of summary judgment.  The Court need not address any potential state-law based arguments that were not made.  *See Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 312 (S.D.N.Y. 1998) (deeming a claim abandoned where the claim was alleged in the complaint but not "raised elsewhere in the record"). And even if a state claim were properly raised, Plaintiffs would still likely bear the burden of proof in *this* proceeding because the Second Circuit has said that where the SRO has "concluded that the IEP[] [was] proper, . . . the courts are bound to exhibit deference to that decision," and therefore "the burden of demonstrating that the . . . Review Officer[] erred is properly understood to fall on the plaintiffs."  *M.H.* 685 F.3d at 225 n.3.  Thus, unless the evidence is "in equipoise," the burden-shifting is irrelevant to the outcome.  *See id.*

237 (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)).  However, parents who unilaterally withdraw their child from the public schools in favor of a private placement do so at their own financial risk. *See A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009).

In deciding whether tuition reimbursement for such a private placement is warranted, a court must consider at the threshold (1) whether "the state has complied with the procedures set forth in the IDEA," and (2) whether the IEP developed "through the [IDEA]'s procedures is reasonably calculated to enable the child to receive educational benefits." *Cerra*, 427 F.3d at 192 (alteration and internal quotation marks omitted).  If the answer to both of these questions is yes, no reimbursement is permissible. *See id.* ("If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." (internal quotation marks omitted)).

If the answer to either of those questions is no — that is, if the state has either violated the procedural requirements of the IDEA or if it has not developed an IEP that is reasonably calculated to confer educational benefits — then reimbursement for the unilateral placement may be available to a plaintiff.  In determining whether reimbursement is appropriate the court then considers whether "the private schooling obtained by the parents is appropriate to the child's needs." *See id.*; *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009).  If it is appropriate, "equitable considerations" must "support the [parents'] claim." *A.D. v. N.Y.C. Bd. of Educ.*, 690 F. Supp. 2d 193, 205 (S.D.N.Y. 2010); *see also Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 363-64 (2d Cir. 2006) ("'[E]quitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.'" (second

alteration in original) (quoting *Burlington*, 471 U.S. at 374)).  Because the Court may order

"such relief" as it deems "appropriate," 20 U.S.C. § 1415(i)(2)(C)(iii), and because a

reimbursement award is discretionary, *see* 20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or hearing

officer may require the agency to reimburse the parents for the cost of [private] enrollment . . .

."), the Court "enjoys broad discretion in considering equitable factors relevant to fashioning

relief," *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (citing *Carter*,

510 U.S. at 16).  *See also, e.g.*, *R.L. ex rel. E. Z.-L. v. N.Y.C. Dep't of Educ.*, 763 F. Supp. 2d

584, 595 (S.D.N.Y. 2011) (same).

## B.  Standard of Review

Unlike with an ordinary summary judgment motion, the existence of a disputed issue of

material fact will not necessarily defeat a motion for summary judgment in the IDEA context.

*See T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009);

*Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).  Instead,

summary judgment in IDEA cases is "in substance an appeal from an administrative

determination, not a summary judgment."  *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*,

397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted).

### 1. Standard of Review Principles in IDEA Reimbursement Cases: The *M.H.* Decision

The standard of review is often critical in an appeal from an administrative action.  Yet in

IDEA cases, it has been difficult to navigate the sea of prior judicial opinions to discern exactly

how a court is to review various aspects of the state's determination.  In particular, where, as

here, the SRO and the IHO reach different conclusions, how much deference to give the

determination — and to whom to grant that deference — has often been a vexing question.  *See*

*R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) (noting the question had been unanswered until mid-2012).  Therefore, this Court has, in its prior opinions, drawn on a wide variety of Second Circuit and district court cases to explain the nuances of the applicable standard of review, with each new Court of Appeals case seeming to add another wrinkle to the inquiry.  *See, e.g.*, *E.W.K. ex rel. B.K. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 884 F. Supp. 2d 39, 47–48 (S.D.N.Y. 2012); *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 570 (S.D.N.Y. 2010).

Helpfully, in June 2012, the Second Circuit clarified the SRO/IHO deference question, plus many other issues in this area, in its opinion in *M.H. v. N.Y. C. Dep't of Educ.*, 685 F.3d 217.  Synthesizing the Second Circuit's IDEA precedents, *M.H.* comprehensively clarified virtually all aspects of a district court's review of a state's reimbursement determination.  *See id.* In sum, *M.H.*, held that "[w]here the IHO and SRO disagree, reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of *the SRO* as the final state administrative determination."  *Id.* at 246 (emphasis added).  It is worth quoting *M.H.* at length to understand the scope of that deference and the reasoning behind it.

The *M.H.* court began with two propositions that are arguably in tension with one another.  On the one hand, a "reviewing court 'must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence.'"  *Id.* at 240 (quoting *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007)) .  At the same time, "such review 'is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'"  *Id.*

(quoting *Rowley*, 458 U.S. at 206).  Navigating between these two poles is what *M.H.* is about, and what makes reviewing state court reimbursement determinations delicate.

> The court in *M.H.* continued:

> [F]ederal courts reviewing administrative decisions must give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.  District courts are not to make subjective credibility assessments, and cannot choose between the views of conflicting experts on controversial issues of educational policy in direct contradiction of the opinions of state administrative officers who had heard the same evidence.  As the Supreme Court has said, "once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States."  *Rowley*, 458 U.S. at 208.

*Id.* (most internal quotation marks, citations, and alterations omitted).

Next, turning to the question of to whom a federal court owes this deference when the SRO and IHO disagree, and whether that level of deference is altered based on the disagreement, the Court of Appeals stated that courts "generally 'defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer.'"  *Id.* at 241 (quoting *A.C. ex rel. M.C.*, 553 F.3d at 171).  "'Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful.'"  *Id.* (quoting *Walczak*, 142 F.3d at 129).

The *M.H.* court next reviewed the question of deference to state decisionmakers answered by the Supreme Court's decision in *Rowley*, and then it went decision-by-decision to highlight the specific questions left unanswered by the Supreme Court but subsequently decided by the Second Circuit.  *Id.* at 242–44.  This Court need not repeat those questions here.  It is enough to note that, in reviewing and synthesizing those decisions, the Second Circuit chose to

continue with the nuanced standard of review calculus it had previously articulated, and it refused the invitation of an *amicus* to replace that line of cases with "a bright-line standard to be applied by district courts in reviewing state administrative decisionmaking in IDEA cases." *Id.* at 243.

After reviewing the prior decisions, the Second Circuit agreed with a summary of the standard of review in IDEA cases given by the First Circuit: that is, "the standard for reviewing administrative determinations 'requires a more critical appraisal of the agency determination than clear-error review . . . but . . . nevertheless[ ] falls well short of complete de novo review. . . . [I]n the course of th[is] oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale.'" *Id.* at 244 (alterations in original) (quoting *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086–87 (1st Cir. 1993).

    2. Application Here

The Second Circuit concluded its discussion of standard of review principles in *M.H.* with four illustrations.  In this case, most aspects of those illustrations augur in favor of deference to the SRO's determination.  While the standard of review the Court uses here cannot be easily summarized, applying those illustrations helps illuminate the contours of the inquiry.

First, the *M.H.* court said that "determinations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures." *Id.* at 244.  Here, Plaintiff does not press any procedural violations of the IDEA.  (Pl. Mem.; Pl. Reply; *see also* Def. Mem. 9 ("[T]here can be

no principled dispute here but that the District . . . compl[ied] with IDEA's procedures.").[7]  This "illustration" therefore points in favor of granting the SRO's determination "more weight."

Second, "[d]ecisions involving a dispute over an appropriate educational methodology should be afforded more deference than determinations concerning whether there have been objective indications of progress."  *M.H.*, 685 F.3d at 244.  Here, this illustration cuts both ways, because in this case the Court is dealing with aspects of the decision touching on both educational methodology and objective indications of progress.  Thus, application of this illustration means that the Court must be mindful that the level of deference varies slightly depending on what type of evidence the Court is considering, and the Court will accordingly grant more deference to the former determination than the latter.

Third, "[d]eterminations grounded in thorough and logical reasoning should be provided more deference than decisions that are not."  *Id.*  Here, the SRO's 24-page, single-spaced decision merits deference on this basis.  The decision is thorough in that it discusses, in detail, all of the aspects of the IEP and all of the purported deficits identified by Plaintiffs.  (SRO 13–24.)  The SRO's decision also merits deference on this score because the SRO engaged meaningfully with the record, and where the SRO disagreed with the IHO, the SRO made sure to explain that departure, giving specific record citations when doing so.  (*Id.*)

Fourth, "the district court should afford more deference when its review is based entirely on the same evidence as that before the SRO than when the district court has before it additional evidence that was not considered by the state agency."  *M.H.*, 685 F.3d at 244.  Here, the Parties

---

[7] The IHO and SRO both addressed alleged procedural violations, but Plaintiffs have abandoned them before this Court.

supplied no additional evidence; this Court is identically situated to the SRO in that respect. Thus, more deference is warranted on that basis.

In sum, the foregoing discussion shows that there is no easy way to summarize the deference owed the SRO; the deference principles cannot be summarized in one sentence. Instead, the foregoing analysis is meant to provide a window into how the Court must treat the various aspects of the SRO's decision.

C.  Analysis

1. Procedural Compliance with the IDEA

In considering whether a school district has satisfied the procedural requirements of the IDEA, courts must "'focus on whether the [parents] had an adequate opportunity to participate in the development of [the] IEP.'"  *Dzugas-Smith v. Southold Union Free Sch. Dist.*, No. 08-CV-1319, 2012 WL 1655540, at *27 (E.D.N.Y. May 9, 2012) (alterations in original) (quoting *T.P. ex rel. S.P.*, 554 F.3d at 253).  The IDEA requires, among other things, "'[a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent evaluation of the child.'"  *Cerra*, 427 F.3d at 192 (quoting 20 U.S.C. § 1415(b)(1)); *see also T.L. ex rel. B.L. v. Dep't of Educ.*, No. 10-CV-3125, 2012 WL 1107652, at *14 (E.D.N.Y. Mar. 30, 2012) ("Parental participation requires an opportunity to examine records, participate in meetings, and to obtain an independent evaluation." (internal quotation marks omitted)).

Plaintiffs do not raise any procedural violations in their motion papers nor in their

Complaint, which alleges that T.B. was denied a FAPE because of substantive inadequacies of the IEP for the relevant school year.  (Compl. ¶¶ 151.)  In the state proceedings, Plaintiffs did raise the issue, but the IHO — who agreed with Plaintiffs as to the substantive inadequacy of the IEP — easily dismissed the procedural claims.  (IHO 9–10 ("Given the Parents' extensive participation in the June 14, 2010 CSE meeting and the District's compliance with other procedural requirements leading to the CSE meeting, I am satisfied that the District fulfilled IDEA's procedural obligations."))

The Court, too, is satisfied that the District has complied with the procedural requirements of the IDEA.  Plaintiffs were given an opportunity to examine records and participate in meetings, and they have not alleged otherwise in this Court.  For instance, the record shows that, at the June 14, 2010 meeting, both T.B.'s mother and the family's counsel were present.  (Joint Exh. 15 at 6.)  The comments of the meeting reveal that Mrs. B. voiced her displeasure with the IEP and said that she would unilaterally place T.B. at Community.  (*Id.*) Despite her displeasure, Mrs. B., with the assistance of the District, conducted a visit to the recommended program on June 26, 2010.  (Joint Exh. 26.)  As explained in detail in the facts section above, the record also shows that T.B.'s parents have meaningfully participated in the IEP process from the very beginning of T.B.'s schooling.  (Joint Exh. 5 at 5 (Mrs. B. and grandmother present at program review on Nov. 29, 2007); Joint Exh. 4 at 5 (both parents present at reevaluation meeting on Jan. 21, 2008); Joint Exh. 3 at 5 (Mrs. B. present for annual review on May 21, 2008); Joint Exh. 2 at 5 (both parents present at program review on Jan. 22, 2009); Joint Exh. 18 at 5 (Mrs. B. and grandfather present at reevaluation/annual review on June 22, 2009).)

2. Substantive Adequacy of the IEP

Viewing the SRO's conclusions through the lens of the required deference to state educational officials, the Court concludes that an independent review of the record reveals sufficient support for the administrative determination that the June 14, 2010 IEP was likely to allow T.B. to make progress.  Accordingly, the Court finds that the District has proven by a preponderance of the evidence that the IEP in question was reasonably calculated to provide T.B. with a FAPE, and Plaintiffs' request for reimbursement is denied.

a. Overview of Arguments

The heart of Plaintiffs' argument is that the *only* way that T.B. could make educational progress in the 2010–11 school year — his third-grade year — was by learning in a setting where every class was taught with a low teacher-student ratio and geared toward the needs of students with average intelligence but with T.B.'s particular learning disabilities.  Plaintiffs contend that T.B. sits in the center of a triangle outlined by three educational options: because none of these three in-district options would confer progress, T.B.'s parents should be entitled to send T.B. to Community.  (Pl. Mem. 17.)

First, because T.B. tested with average intelligence, and indeed excelled in math, "[i]f the District placed T.B. in one of their small, structured classrooms, his management needs could be met, but he would be too high functioning and it would be 'giving up on him.'" (Pl. Mem. 17.)[8] Second, if the District instead "placed him in a general education class," then he would be "with children of his own intelligence level, but could not keep up due to his disabilities."  (*Id.*)  Third,

---

[8] The phrase "giving up on him" is presumably a reference to the testimony of Mrs. B. that Ms. Newman, the school psychologist, told Mrs. B. that "putting T. in a self-contained classroom" in the public school system was "basically giving up on my son."  (Tr. 638.)

if the District were to give "give T.B. enough supports such that he could be maintained in the general education setting[,] he would need so much support that it rendered the mainstream placement meaningless." (*Id.*)  Accordingly, say Plaintiffs, T.B. "falls between the cracks of the available continuum of placements at the District," and the unilateral placement at Community is the only way to allow him to make progress.  (*Id.*)

The SRO disagreed, and found that the IEP "accurately reflected the student's needs and that the district's recommended program was reasonably calculated to enable the student to receive educational benefits in the LRE ["Least Restrictive Environment"]."  (SRO 24.)  The District notes that T.B. did make substantial progress in many areas in an integrated setting during kindergarten and first grade, even if he did lag behind in reading and writing.  (Def. Mem. at 10–11.)  However, for precisely this reason, the District modified his IEP several times, and the third-grade IEP "provided even more support for T.B. in the areas of reading and language arts" than the upgraded second-grade IEP would have.  (Def. Mem. at 12.)  Further, the District contends that T.B.'s attentional issues were not related to class size per se, but rather were related to the "specific activity with which he was presented."  (Def. Mem. at 13.)  Thus, the solution in the IEP of placing T.B. in a general education class with pull-outs and substantial support for reading and writing would enable T.B. to make meaningful educational progress during his third-grade year.

To determine whether the record supports the SRO's determination, the Court must analyze separately various aspects of the IEP and T.B.'s needs.  The SRO termed these "Class Size," "Pull-Outs," and "LRE."  For convenience, the Court addresses these issues below in the order in which the SRO addressed them.

b. Class Size

As mentioned, the challenged IEP called for T.B. to be placed in a general education third-grade class, which has a student-teacher ratio of 20:1, (Tr. 179), with extensive modifications.  As relevant here, those modifications include: 1) a reading and language class, with a ratio of no more than 15:1, for 90 minutes per day; 2) daily supplemental reading instruction, with a ratio of 2:1, for 40 minutes per day; 3) weekly occupational and speech therapy, each with a ratio of 5:1, each for 30 minutes per week; and direct and indirect teacher consultant services within the general education class.  (Joint Exh. 15 at 1–2.)

The IHO found this IEP did not provide for a sufficiently small class size to allow T.B. to progress, and he found this dispositive to his determination.  (IHO 11.)  The IHO, looking primarily to the reports of the neurologist Ronald Jacobson, (Pl. Exh. L), the psychiatrist Susan Hoerter, (Pl. Exh. N), and the learning specialists Shaune Bornholdt and Risa Battino, (Pl. Exh. S), said that the evidence showed that T.B. cannot progress in a classroom of more than 12 students.  (IHO 11.)  Rather, these independent analyses "speak with a single voice": "the small class size *is* the basic floor of opportunity."  (*Id.*)

The SRO disagreed.  First, the SRO correctly noted that educators must consider outside expert reports, but they need not follow their recommendations.  (SRO 19 (citing, among other cases, *M.H. ex rel. H.H. v. N.Y.C. Dep't of Educ.*, No. 10-1042, 2011 WL 609880, at *12 (S.D.N.Y. Feb. 16, 2011) ("[A]lthough a CSE is required to consider reports from private experts, it is not required to follow all of their recommendations.").)  The SRO then noted that the IEP was acceptable because there was evidence that T.B. "demonstrated progress while

participating in the consultant teacher model, that the student's distractibility and anxiety were not related to class size, and that the program recommended by the June 14, 2010 CSE was designed to provide the student an appropriate education in the LRE."  (SRO 19–20.)  Finally, the SRO disagreed with the IHO's bright-line view of the expert testimony that there was *no* way for T.B. to progress if he is in a class with more than 12 students for any part of his day, writing instead that two of the experts were not so specific, two had not visited the District's suggested program, and there were conflicting recommendations from district staff who had worked with T.B.  (SRO 20–21.)

The Court concludes that it is appropriate to defer to the SRO's thorough treatment of this issue.  Critical here is T.B.'s demonstrated progress in areas other than reading and writing.  For example, ample evidence demonstrates his continued progress in math, even during the time in which he was in a general education environment with few modifications.  His IEP of June 22, 2009, prepared just after his first-grade year in public school, says that T.B. "is capable of completing grade appropriate math tasks with minimal support."  (Joint Exh. 18 at 3.)  His first grade teacher, Mrs. Cook, wrote a report at the end of his first grade year saying that T.B. "has made outstanding progress in math.  He was unable to count past fourteen when entering first grade," but he later "developed an excellent sense of hard numbers and their value."  Further, "he finds great joy in working in this discipline."  (Pl. Exh. OO; *see also* Tr. 396 (Mrs. Cook Testimony — "Q: So math you would say is a real strength for T? A: Absolutely.  Light bulbs went off, something clicked and he loved it.").)  The principal of the school testified that math was historically an area of strength, and that T.B. never required a "self-contained class for mathematics while he was in the district."  (Tr. 93.)  And T.B.'s first-grade special education

28

teacher, when asked "In first grade did T. make progress in math?", simply responded "Yes." (Tr. 1955.)

Also critical is the fact that, according to the 2010–11 IEP, T.B. would, in fact, receive instruction for a substantial portion of the day in a small class size.  The IEP specified daily supplemental reading instruction for 40 minutes each day in a 2:1 ratio setting.  (Joint Exh. 15 at 2.)  The IEP at issue thus contained a substantial increase in time T.B. would spend in a small, intensive reading class from his first-grade year in public school, when his IEP did not contain any individualized reading instruction of that type.  (Joint Exh. 2 at 1–2.)  Instead, in first grade, his small group instruction consisted only of counseling, occupational therapy, and speech/language therapy, all at a 5:1 ratio, either once or twice a week.  (*Id.*)  Therefore, while Plaintiffs attempt to make a comparison between his first-grade year in public school and the third-grade IEP, there are meaningful differences between the two, including the substantial increase in time that T.B. would spend in a small, even nearly individualized, setting, focused on his reading and writing challenges.[9]

Plaintiffs have two responses to the argument that T.B. can make progress spending some of his time in a class with more than a few other students.  First, while Plaintiffs do not seem to dispute that T.B. progressed — indeed, flourished — in a general education math class, they contend that, to continue succeeding in math, T.B. needs a small class "now that his math problems are getting more difficult."  (Tr. 739 (Testimony of Mrs. B.); *see also* Tr. 941

---

[9] For this reason, the Court finds it less than edifying to compare in great detail T.B.'s report card in first grade in public school versus his report card in second grade at Community. No matter how much different his performance was in the two settings, the IEP for his third-grade year in public school would have made his third-grade experience very different from his first-grade experience.

(testimony of Dr. Bornholdt that, in math, "he really can't handle the word problems without somebody helping him with the reading").)  This is so because "T. has a problem with breaking things down into steps."[10]  (Tr. 739.)  But the trouble with this argument is that, even if it might make some logical sense, it is quite speculative.  *See Student X v. N.Y.C. Dep't of Educ.*, No. 07-CV-2316, 2008 WL 4890440, at *17 (E.D.N.Y. Oct. 30, 2008) (rejecting the proposition that a certain service was necessary because the evidence that "Student X would regress or make only trivial progress without the . . . services was speculative").  And where Plaintiffs rely on speculation, the preponderance of actual evidence in the record, which is explained above, points to the conclusion that T.B. has a history of making substantial progress in math in a general education setting.  When faced with these two strands of evidence, it was reasonable for the SRO to conclude that T.B. did not require a very small class like the one at Community to make some meaningful progress in third-grade math.

The second response is a more general response, and one that is potentially more powerful for Plaintiffs.  Plaintiffs contend that because T.B. should be in a learning environment where he can "reduce his anxiety, improve attention, address his behavioral difficulty, and develop his social skills," a class size greater than 12 at any point in the day is always inappropriate.  (Pl. Exh. S. at 7.)  This sort of reasoning forms the core of Dr. Bornholdt's testimony, such as where he discussed T.B.'s problems with "being able to screen out background noise" in a larger class, his need to "get immediate feedback," and in general his

_____

[10] Dr. Bornholdt testified that T.B.'s test scores in some areas of math went down even after spending one year at Community — but that may have been an anomaly, as Dr. Bornholdt still believed math was a strength for T. as of the time Dr. Bornholdt testified before the IHO. (Tr. 928–29.)

need to "just not feel so very overwhelmed." (Tr. 821–22.) Thus, it is not necessarily the nature of what T.B. is learning but rather T.B.'s attentional and behavioral issues that require a sustained environment of small classes.

This evidence alone could have carried the day for Plaintiffs — but there was contrary evidence in the record. Indeed, the SRO pointed to a plethora of other evidence, including some submitted by Plaintiffs themselves, that shows that some of T.B.'s anxiety was "task-specific," and that, on certain tasks, T.B. could in fact be comfortable and make progress in a general education environment. (SRO 20.) His first-grade report card shows T.B. meeting grade level standards in art, music, and physical education. (Parents' Exh. E.) The progress report on his January 22, 2009 IEP — written in the middle of first grade — states that T.B. "is able to follow classroom routines and engage in lessons and activities with moderate support" but "becomes more agitated for writing tasks." (Joint Exh. 2 at 3.) Ms. Newman, the school psychologist, testified that, by the end of T.B.'s first grade year, T.B.'s "play skills ha[d] improved and he [was] enjoying engaging with others, better able to stay on task, but that there definitely was the anxiety in the classroom when he perceived he wasn't capable of completing a task, especially in the area of literacy."[11] (Tr. 1835.) His first-grade special education teacher answered

_____

[11]As the SRO pointed out, the IHO's characterization of the testimony of Ms. Newman as "inconsistent" appears to be something of an overstatement based on her testimony. (*Compare* SRO 21 n.26 *with* IHO 12.) The IHO was correct in observing that Ms. Newman's final written reports from T.B.'s first-grade year stated that T.B.'s anxiety made it difficult for him to "enjoy positive peer interactions" in the classroom, while Ms. Newman's testimony, as mentioned above, included a more favorable assessment of T.B.'s attitude. (IHO 12; *accord* Tr. 1835–36.) But, in direct response to questioning by the IHO, Ms. Newman fully explained the discrepancy: she "wish[ed] [she] had written another report about his social/emotional functioning in June as opposed to April, because there was change towards the end of the school year . . . . There was not another report." (Tr. 1836.) This explanation is sufficient to warrant this Court's deference to the SRO's determination that Ms. Newman's testimony was credible and not necessarily

affirmatively to the question whether T.B. had made "progress with regard to his social skills," during his first grade year.  (Tr. 1955.)  And in a phone call between Plaintiffs' counsel and his first-grade teacher, the teacher said in no uncertain terms that "T.B. could get math and he had no anxiety."  (Joint Exh. 30 at 3.)

To be sure, the aforementioned evidence does not necessarily contradict the notion that a full-day small class size would be the *ideal* setting for T.B.  But that is not the critical question, and no one testified that T.B. has no problems with anxiety *whatsoever* in a large, or even a small, setting.  The important question instead is whether T.B. could make some educational progress in a setting where he did not spend the entire school day in a very small class.  There was ample, if not overwhelming, evidence in the record showing that he could have made progress in the setting specified in the IEP.  When faced with conflicting expert testimony, the Second Circuit has said that district courts "cannot 'ch[oose] between the views of conflicting experts on . . . controversial issue[s] of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence.'"  *M.H.*, 685 F.3d at 240 (alterations in original) (quoting *Grim*, 346 F.3d at 383).  Therefore, the Court will not disturb the SRO's findings on this point.

Finally, it is important to note for the class size inquiry that, while the Court recognizes there was testimony that revised downward the IEP's specified 15:1 ratio for the specialized reading class, the SRO did not rely on that downward revision, and this Court does not do so either.  Indeed, under recent Second Circuit caselaw, relying on such retrospective testimony

---

inconsistent with her written assessments, which all pre-dated the improvements she saw in T.B. (*See* SRO 21 n.26.)

would be impermissible.  *See R.E.*, 694 F.3d at 186. Rather, as the foregoing discussion makes clear, today's decision affirms that the SRO's determination that the IEP itself provides a FAPE is amply supported by the record evidence.

In particular, at the fall 2010 due process hearing, Ms. Gutierrez, the special education teacher, testified that the class would actually have been smaller than 15:1.  She testified that she had in her class six students plus a teacher, making the ratio 6:1, and the ratio therefore would have increased only to 7:1 if T.B. were in the class.  (Tr. 497.)  But under *R.E.*, "the IEP must be evaluated prospectively as of the time of its drafting."  694 F.3d at 186.  Indeed, in discussing examples of such impermissible retrospective testimony, the *R.E.* court specifically stated that the school district "may not introduce evidence that modifies [the IEP's] staffing ratio."  *Id.* at 187; *see also Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, No. 12-CV-2113, 2012 WL 6136493, at *6 (S.D.N.Y. Dec. 11, 2012) (rejecting testimony given at an IHO hearing that the IEP-recommended 1:1 paraprofessional support for a transitional period could be extended).[12] Ms. Gutierrez's testimony therefore falls squarely into the category of impermissible testimony.

_____

[12] The Second Circuit contrasted this impermissible retrospective testimony with testimony describing the substance of a program or service listed in an IEP, on which a court or a hearing officer may rely.  *See R.E.*, 694 F.3d at 186 (permitting reliance on testimony "that explains or justifies the services listed in [an] IEP"); *F.L. ex rel. F.L. v. N.Y.C. Dep't of Educ.*, No. 11-CV-5131, 2012 WL 4891748, at *14, n.18 (S.D.N.Y. Oct. 16, 2012) (stating that testimony about the make-up of the 6:1:1 class was "acceptable as far as it describe[d] the substance of the assigned 6:1:1 program").  For instance, a court may rely on testimony that describes both an IEP's recommended method and "why it was appropriate," or testimony explaining how an IEP recommended service "operates."  *R.E.*, 694 F.3d at 186–87 (noting that "if a student is offered a staffing ratio of 6:1:1, a school district may introduce evidence explaining how this structure operates and why it is appropriate").  Indeed, testimony of this sort is at the very heart of the hearing process, and the Court has therefore relied on such testimony throughout.  Because *R.E.* was decided after the Parties here fully briefed this motion, the Court discusses Ms. Gutierrez's impermissible testimony to make clear that the retrospective testimony did not enter into the Court's analysis.

Accordingly, notwithstanding the testimony that the reading class may have been smaller than described in the IEP, the Court must evaluate the class at a 15:1 staffing ratio, and it has done so.  Further, 15:1 is also the staffing ratio used by the SRO to evaluate the IEP, (SRO 20), and therefore the Court need not adjust the level of deference to give the SRO's determination.

### c. Pull-outs

In deciding that the IEP was inappropriate, the IHO contended that the IEP at issue "demonstrates a disregard for . . . [T.B.'s] need for fluid transitions between classes," and other related concerns, such as the effect of missing recess, P.E., or other academic lessons.  (IHO 14.)  But while the SRO's rejection of this point on the ground that such concerns do not really impact the adequacy of the IEP because they are "administrative issues" is perhaps the least persuasive aspect of his decision, (SRO 22), the record supports adopting the SRO's ultimate determination.

First, it is clear from the record that, as of the IEP date, T.B.'s daily schedule was not yet set.  Rather, the record contains three different proposed schedules, all of which attempt to balance T.B.'s need for enhanced instruction with the desire to minimize disruptions.  (Joint Exh. 44–46.)  In two proposed schedules, T.B. would miss some math class once a week for Wilson reading instruction, but in another he would not.  (*Id.*)  Likewise, in one schedule he would miss recess two days per week for Wilson instruction, but in the other two he would miss recess only once.  (*Id.*)  Thus, while T.B. would certainly experience *some* disruption in his day from pull-outs at different times, what that disruption would be was unknown, and therefore, as the SRO said, "speculative."  (SRO 22.)

Further, for his second set of daily "pull-outs," T.B. would not be missing anything for which he would later be accountable.  Rather, toward the end of each day, he would be pulled

out of "writer's workshop" to do occupational and speech therapy.  (*Id.*)  That was done because, according to one teacher, students also receive writing instruction in their reading classes because "most often writing and reading are connected."  (Tr. 1956.; *see also* Tr. 590 (testimony of the special education teacher that "during the reading workshop I also do a writing component").)  Also, in first grade, T.B.'s occupational therapist wrote that T.B. "continues to separate easily from the morning program" to come to therapy — a conclusion that undermines the claim that T.B. would not easily transition from class to therapy each day.  (Joint Exh. 9 at 1.)  To be sure, there was some testimony that because the overlap between therapy and the writer's workshop was imperfect — T.B.'s daily therapy did not start until five minutes after writer's workshop started, and it would end ten minutes before the end of the class — this schedule would increase "frustration" and "anxiety."  (Tr. 1665.)  The Court keeps this possibility in mind; but, on the other side of the ledger, the daily therapy is also expected to benefit T.B. substantially, and indeed the aforementioned evidence shows that he seemed not to mind leaving class to go to therapy in first grade.  In the end, there is no evidence in the record that the disruption due to missing "writer's workshop" would be out of proportion to the benefits of daily therapy, or so great that it would entirely undermine any educational benefit to T.B.  Thus, there is sufficient record evidence to support the SRO's conclusion that the pull-outs would not deny T.B. a FAPE on this ground.

Second, the record does not support the IHO's assertion that the IEP shows a "disregard" for the need for "fluid transitions."  (IHO 14.)  To the contrary: there was testimony that the public school officials thought long and hard about how to make the day for T.B. and similar students go as smoothly as possible.  As the principal testified, the special education classroom

in the school T.B. would attend is directly next to the general education classroom.  (Tr. 150.)

At the designated time, T.B. would go next door with several other students to receive

specialized reading and language arts instruction.  (*Id.*)  Further, the teacher who took those

students into the special education classroom would have been co-teaching in the general

education class in the morning — "they're integrated," testified the principal, referring to both

the teachers and the students — and this signals that the transition would be relatively smooth.

(Tr. 151.)

      In addition to the proximity of the special education classroom itself, Dr. Bornholdt, the

parents' main expert, observed the public school setting that would have been part of T.B.'s IEP,

and he noticed that the "transitions, students transitioning in the hallway from class to class" was

"orderly," even if it was "louder" than it would have been at the much smaller Community.  (Tr.

886–87.)  Moreover, as Dr. Bornholdt admitted on cross examination, not only would T.B. stay

"with the same kids in the self-contained class for English language arts every day," but this

class takes place "while the kids in the regular ed class get English language arts."  (Tr. 947.)

      Thus, the only risk of substantial disruption comes from the pull-out for daily specialized

reading instruction.  While there is some cause for concern here that finding the required 40

minutes for this program each day might impede T.B.'s learning, that is in part because T.B.

would receive this instruction five days per week, as recommended by Dr. Bornholdt, rather than

three times per week, which "is what children usually get," as Dr. Bornholdt testified.  (Tr.

945–48.)  But here the perfect must not be the enemy of the good: some small amount of

disruption does not necessarily negate all potential benefits of the specialized instruction in the

IEP.  The SRO's determination that the District could have successfully minimized the impact of

disruption is worthy of deference in light of the evidence in the record.  (SRO 22.)

Finally, as a conceptual matter, disruptions to the school day are but the flip side of the statutory requirement that T.B. be educated in the least restrictive environment possible.  *See* 20 U.S.C. § 1412(a)(5).  As explained further below, this requirement means that a school district should "'take[] creative steps to provide [the student] as much access to nonhandicapped students as it can, while providing him an education that is tailored to his unique needs.'"  *Mr. and Mrs. P. ex rel. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 121 (2d Cir. 2008) (second alteration in original) (quoting *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1050 (5th Cir. 1989)).  But providing a creative program in a mainstream environment that is responsive to an individual student's needs will often result in some amount of disruption to the student's day.  Here, the evidence does not show that the District chose a course that pushes too far in the direction of mainstreaming.  Rather, the evidence shows that deference to the SRO is warranted for the conclusion that the issues surrounding T.B.'s schedule could have been solved so that any effects of disruptions did not entirely undermine the educational benefits of mainstreaming for certain subjects.  (SRO 22; *see also id.* at 24 ("[T]he hearing record reflects that, in the areas of speech-language skills and social skills, the student would have benefitted while participating in a mainstream environment.")

### d. Least Restrictive Environment

The IDEA contains a requirement that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that

education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."  20 U.S.C. § 1412(a)(5)(A).  This is the Least Restrictive Environment, or LRE, requirement.  *See, e.g.*, *Walczak*, 142 F.3d at 122 ("Because the law expresses a strong preference for children with disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers, 20 U.S.C. § 1412(5), special education and related services must be provided in the least restrictive setting consistent with a child's needs.").

In 2008, the Second Circuit adopted a two-pronged test for determining whether this LRE requirement is met.  First, a court must consider "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child." *Newington Bd. of Ed.*, 546 F.3d at 120 (internal quotation marks omitted).  Second, if not, a court considers "whether the school has mainstreamed the child to the maximum extent appropriate." *Id.* (internal quotation marks omitted).

Here, it is clear that T.B. could not be educated in the regular classroom for the entire day; that is not contested.  (SRO 23; Pl. Mem. 19; Def. Mem. 13.)  Rather, Plaintiffs contend that the District veered too far into the realm of mainstreaming — that is, the proposed IEP is not restrictive enough.  Specifically, Plaintiffs' "position is that the Consultant Teacher model [as in the IEP] is inappropriate because in order to maintain T.B. in this General Education setting, T.B. requires so many supplemental services, the majority of which are 'pull out,' that when the IHO 'did the math' it is clear that T.B. would end up missing crucial classroom work."  (Pl. Mem. 19.)

The Court finds there is insufficient evidence to overcome the SRO's findings on this point.  Roughly speaking, T.B.'s schedule would keep him in the general education environment

for much of the morning, including nearly every day for specials, math, science or social studies
— subjects in which T.B. performed well — plus for such quotidian but important activities as
"morning routine," "snack," "recess" and "bucket filling."[13]  (Exh. 44–46.)  As the SRO found,
there was ample evidence in the record that T.B. could make both educational and social
progress in this environment.  (SRO 23.)  According to his school therapist, during lunch, T.B.
"wanted to be with other children."  (Tr. 1887; *see also id.* ("I saw that he was connecting with
kids in the lunchroom.  I saw that he was talking to them.  We facilitated that to help him, and I
saw progress." )  By the middle of T.B.'s first-grade year, the notes on his IEP stated that
"[s]ocially and emotionally [T.B.] has become more social and less impulsive."  (Joint Exh. 2 at
4.)

 Indeed, the IEP is responsive to Plaintiffs' own concern that the District not "give up" on
T.B. by placing him in a full-day special education environment.  (Pl. Mem. 17.)  The IDEA
embodies this very concern, since it "imposes on school districts developing IEPs a strong
preference for 'mainstreaming,' or educating children with disabilities '[t]o the maximum extent
appropriate' alongside their non-disabled peers."  *Grim*, 346 F.3d at 379.  But Plaintiffs cannot
invoke that principle and then, in a single sentence in their brief, imply that there is only one way
to satisfy it: private school.  Rather, as already explained, there is sufficient evidence to support
the SRO's conclusion that the IEP here does indeed balance T.B.'s individual educational needs
with the command that he have as much interaction with his general education peers as possible.
Other courts have also found that where an IEP places a student in a class that is somewhat

---

[13] While "bucket filling" sounds like an activity for much younger children than T.B., it is
actually a "bodily kinesthetic game" connected to reading and writing skills.  (Tr. 523.)

larger than Plaintiffs' "preferred class size," that IEP can still meet the "IDEA's objectives of fulfilling [the student's] educational needs while mainstreaming [the student] in a regular education class to the maximum extent possible." *D.B. ex rel. K.B. v. N.Y.C. Dep't of Educ.*, No. 10-CV- 613, 2011 WL 4916435, at *2, 11 (S.D.N.Y. Oct. 12, 2011) (holding that student's IEP that specified "an instructional setting for both general education and special education students taught by one special education teacher and one general education teacher," where student was behind grade-level in some areas but at grade-level in others, provided a FAPE).

* * *

We all want the best for our children.  The Court commends everyone involved in this case — T.B.'s parents and family, the educators and administrators in the District and at Community, the medical professionals and outside evaluators, those involved in the state administrative proceedings, and all counsel — for keeping that in mind throughout this process. Much in the record and everything that has taken place before this Court reveals that the dispute over the proper educational placement for T.B. has proceeded civilly and in good faith for several years.

In the end, however, it is this Court's job to ensure that the IDEA and related state law requirements have been met: that is, that the school district has created an IEP that is "likely to produce progress, not regression."  *Cerra*, 427 F.3d at 195.  Here, viewing the record through the proper lens of deference to state educational expertise, the Court concludes that there is sufficient evidence to support the SRO's determination that the IEP at issue provided T.B. a FAPE.  Accordingly, Plaintiffs should not be reimbursed for the tuition from their placement of

T.B. at the Community School for the 2010–11 school year.[14]

### III. Conclusion

For the reasons given above, Defendant's Motion for Summary Judgment is granted and

Plaintiffs' Motion for Summary Judgment is denied.  The Clerk of the Court is respectfully

request to terminate the pending motions (Dkt. Nos. 19, 23), enter judgment for Defendant, and

close the case.

SO ORDERED.

DATED:      White Plains, New York
            March 21 , 2013

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

---

[14] Because the Court concludes the District offered the student a FAPE, the Court need not reach the issues of whether the private placement at the Community School was appropriate or whether equitable considerations support reimbursement. *See Mrs. C. ex rel. M.C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000) ("Only if a court determines that a challenged IEP was inadequate should it proceed to the second question [of whether a plaintiff is entitled to reimbursement].")